The next case on our docket is 23-60620, Enhance Technologies, LLC v. the Environmental Protection Agency. Ms. Stetson. Good morning, Your Honors, and may it please the Court. My name is Kate Stetson. I represent the appellant, Enhance. When EPA regulates a chemical under the Toxic Substances Control Act, or TOSCA, it can do so in one of two ways. If the use of a chemical is an ongoing use, EPA has to regulate that use pursuant to Section 6 of TOSCA. If the use is a significant new use, EPA can regulate that use under Section 5 of TOSCA. And the two pathways are different for what might be an obvious reason. If, as Congress explained, a use is an ongoing use, EPA, when it regulates that particular use, has to take into account a number of things. Will the regulation of that use disrupt the status quo? What are the risks and benefits of regulating that particular chemical? There's no such need to do that, of course, when EPA is regulating under Section 5 a new use. Enhance has been fluorinating plastic containers since 1983. But after EPA discovered in about 2021 that Enhance's processes were unintentionally producing very small amounts of PFAS, EPA chose to regulate Enhance's processes pursuant to Section 5, which is the new use regulation. EPA chose the wrong path. Enhance's decades-old processes are not subject to regulation under a significant new use rule. The statute simply cannot be stretched to extend that way. And even if Enhance's processes were subject to regulation under a significant new use rule, despite being in place since 1983, the limited unintentional amounts of PFAS that the fluorination processes produce is not regulable because it is classified by EPA's own regulations as an impurity. Those are the, I would say, the fundamental merits problems with what EPA did. We also make a number of other arguments, as you've seen in our briefs. For one, EPA failed to give Enhance, understandably, fair notice that its decades-old use would be regulated as a significant new use. There's also a panoply of substantial evidence and other problems with what EPA did. But with the Court's blessing, I'd like to focus on the two merits arguments. I want to begin, though, by brushing aside, I hope, a couple of the threshold issues that EPA has raised here. One thing that EPA advanced in its brief is that this Court only has the capacity to review EPA's unilateral orders, in this case, the orders that essentially prohibit Enhance from engaging in its fluorination services. That this Court only has the ability to review those orders for essentially substantial evidence review. That everything else, all the legal questions that underpin EPA's ability to issue those orders are off-limits. That, of course, is not the way the statute reads. The statute that expressly incorporates all of EPA Section 706, except for one thing, it switches out Section E of that statute and replaces it with its own substantial evidence standard. Courts have puzzled about why that was done, but this Court said years ago, whatever the reason, what we take that to mean is that there is a more rigorous substantial evidence standard in place. We've made those arguments, but with respect to the rest of the arguments available under the APA, including, importantly, the idea that EPA cannot regulate outside of statutory and regulatory bounds, that, of course, is completely fair game for this Court. So, on the fundamental question of new use, I think the most obvious place to start and the place this Court always starts is with the statute. EPA can regulate under Section 5 a new use if the use is new. That sounds like it should be a commonplace, but EPA is suggesting that new, in this case, means something other than new. One of the moves that EPA makes in its statutory interpretation is to say, well, the regulations that we're operating under define new chemical substance in a particular way. What the regulations define new chemical substance as is a substance that isn't yet or is about to be named on EPA's list of chemical substances. That's fine, but you would expect that if the Congress expected new use to have that same meaning, a use that's not known to EPA until the time that it goes on a list, Congress would have suggested that definition or EPA would have engaged in that definition. What if it's not known to anyone at the time? In other words, there's scientific advances, and 30 years later, we now can detect and we can find PFAS. I guess I'm going to butcher the acronym, but I can butcher that a lot less than the actual acronym. That's my fault. So, we can now detect these things, and nobody knew. Enhance didn't know, the industry didn't know, and there are these harmful chemicals being produced. Is that then a significant new use? I don't think it is, Your Honor. For this reason, and it actually tracks the facts of this case, right? EPA says, I think at page 14 of its brief, that it didn't discover until just a couple of years ago that the fluorination services that Enhance has long been engaging in were producing these small levels of PFAS. But even so, what EPA did both in its significant new use rule or SNR was to say ongoing uses are not subject to a significant new use rule. So, the question isn't when a use was discovered, it's not when a chemical was discovered, it's not when the presence of a chemical in an ongoing use was discovered. The question is, was the use ongoing at the time of this rule arose? Did Enhance bear any burden to substantiate that its use was ongoing at the time the rule was promulgated? No, it did not. It's one of the moves, I think, that EPA makes in its briefing, and I would encourage you, and I understand we are here on a very fast time frame, and we appreciate the Court's indulgence. I know the briefs have just been filed, but to look at the significant new use rule, what you would expect to see if there was some kind of requirement in the proposed rule back in 2015 that a regulated entity come forward and announce itself, you would expect to see every time EPA talked about ongoing uses to say, you know, identified and confirmed ongoing uses. Ongoing uses for which the regulated entity raises its hand. There's no sort of modifying language around ongoing uses. The question is when the use arose, and even EPA says we're not just going to ask for comments about entities that know that they are using PFAS as of 2015. We're going to also look to other sources, and I want to make clear, Judge Wilson, in response to your question, one of the reasons why I started where I did with Section 5 and Section 6 is that I want to make clear that the ongoing use of a substance that EPA deems harmful is not somehow immune from regulation. It can be regulated. It just has to be regulated under a different statutory pathway. It falls in the Section 6 bucket, which, as I apprehend it, correct me if I'm wrong, the material innovation in Section 6 versus 5 is you've got to do a cost-benefit analysis. Yes, Section 5 says without consideration of cost, essentially, and Section 6 says, among other things, what are the alternatives to this chemical? How is it used? What's the impact on small businesses if this chemical gets taken off the market or this use gets taken off the market? There's a whole range of cost and benefit analyses that the agency must do under Section 6, and as I mentioned, that makes sense because when you're regulating under Section 6 and you're regulating under something that is already an ongoing use, Congress is encouraging the agency to ask, how is this going to disrupt the status quo? What EPA did here, and we said in our brief, and I heard counsel in the case prior mention square peg, round hole, but it's same problem here. EPA chose to regulate this ongoing use pursuant to a statutory regime that just doesn't fit, and that's one of the reasons why I think the EPA is going to the lengths that it does to try to explain, well, use doesn't have to mean new. It can mean newly discovered to us because we had no reason to know it existed before, but new use means a new use, and when you have an ongoing use that everyone concedes, including the government, existed for decades before this rule came out, there is simply no basis on which EPA can regulate a new use under its new use regime. If the court is willing, I'd like to turn briefly to the impurities question because this is another, I think, threshold issue that could resolve the case. If the court concludes, as we think it should, that the plain text of the statute precludes EPA from regulating an ongoing use as a new use, that's the end of the road, and I mention that because there's a suggestion in EPA's brief that because the unilateral orders in this case didn't engage in the kind of legal analysis that they should have, that this court should remand back to the and I don't want to get you off from impurity because I'm interested in that also, but if Enhance had no notice that this rule applied to them when it was being promulgated, we don't even get on the on-ramp, right? I mean, in other words, the orders would be infirmed for that reason, or would they? I think that's another possible exit, but I think more fundamentally, we were envisioning at least the fair notice argument as being even if you and an impurity is not an impurity, we still didn't have fair notice of that interpretation, so we were seeing that almost as a third drop on the drop-down menu. I do take your point, though, that there's an argument that the fair notice is another kind of threshold issue. We think the clearest legal path is to look at the statute, explain that new means new, and reverse on that basis, and I emphasize reverse or vacate on that basis because EPA's suggestion that because the agency didn't do the homework it should have in its unilateral orders on these legal arguments doesn't require a remand. There are certainly circumstances where an agency gets the benefit of a remand, in circumstances where the agency hasn't sufficiently explained itself, hasn't dealt with a particular piece of evidence or argument that the regulated party has made. When an agency exceeds its statutory and regulatory bounds, there is no reason to send it back to the agency for it to explain why it exceeded its statutory and regulatory bounds. But you're not you're not contending they couldn't gin up a section 6 proceeding? I'm sorry? You're not saying they cannot now institute a section 6 proceeding? Oh, no, we're not saying that at all, but to Judge Wilson's point, if they do, they have to engage in a much more thorough, balanced cost-benefit review. So on the impurities issue briefly, one of the things that came up during the comment period in this precise rule, the SNR, was that they had a commenter submit a comment that said, we manufacture fluoropolymers, which are a little bit different from the plastics, fluorinated plastics here, but we manufacture fluoropolymers, and with respect to those, there are some PFAS that are produced during that process. Do we need to identify those? Do we need to submit notices for those? And EPA said no. With respect to those, minute amounts of PFAS that are found in fluoropolymers, those are impurities, and that goes for domestic use, that goes for imports. So this dovetails, I think, both with the fair notice issue and with the way that impurities are supposed to be interpreted under the agency's regulations. Impurities are unwelcome guests that essentially are bound up with the fluorination processes together. They are not extracted at any point during the process. They are not made use of. They have no commercial, you know, separate commercial use. They are unintentionally present within the article that's being fluorinated. That is precisely the definition of impurity under the statute. Now, what EPA's counsel will say is, well, the regulation talks about only an impurity, but I think that counsel is over-reading only an impurity in a couple different respects. When Enhance submitted its notices in an attempt to continue to engage with the agency, it identified these PFAS both as an impurity and a byproduct, and it did so because if the agency was saying, you have to submit these notices, and they had just submitted something as an impurity, I think the concern was the agency wouldn't know what to do with that. So it identified it both as an impurity and a byproduct. But the governing regulatory interpretation here is that when these substances are unintentionally present in, not separable from, and remain with the product, that is fundamentally an impurity under the regulatory definition. It is not solely a byproduct. These are made, and the PFAS are present only as an impurity. Would we need to remand for development of the record as to whether these are impurities and all that? Or did EPA adequately address whether they were or were not? I don't think they did, did they? I see my time is up, but I'd like to answer your question if I could. EPA did not address the legal regulatory question that we're talking about. It said in so many words, these are byproducts. The whole reason that the unilateral orders issued is because EPA made the assumption that they were regulable, that they were not exempt impurities. So, you know, had EPA concluded otherwise, we wouldn't have to be here. If there are no further questions. Thank you very much. Good morning, Your Honors. May it please the Court, Daniel Martin for the United States Environmental Protection Agency. With me on the brief and in argument today is my co-counsel, Alex St. Romain, and with us at council table is Camille Habor from EPA. I intend to focus on part one of our brief, explaining why EPA's risk determination was reasonable and well supported by the record, as well as part two of our brief, explaining why Enhancement's challenges to other regulations beside the orders need not and should not be entertained here. Ms. St. Romain will focus on why those arguments, if entertained, should be of this case. As EPA sees it, there are three buckets of stakes we should be considering here. There is public health and the environment. There are stakes for Petitioner, Enhance, and there are stakes for TSCA as an institution. So to begin with the public health stakes, Enhance manufactures nine highly toxic chemicals called long chain PFAS. Even at what may seem to be the minutest of quantities, these highly toxic chemicals are associated with systemic health effects like cancer, heart disease, and thyroid dysfunction. And under Enhance's conditions of use, these highly toxic chemicals spread everywhere throughout the environment. Now, this is so because of the specific way that these chemicals are used. Enhance fluorinates plastic containers such as lawnmower gas tanks, pesticide storage bins, and household cleaning products. So after these containers pass through their fluorination plants, they create the long chain PFAS in the plastic and then they leach into the containers contents. So once the containers are disseminated throughout the country, these highly toxic chemicals actually go directly into our environment as people mow their lawns, spray crops with pesticides, and clean their homes. But they do this process to keep those other harmful products from escaping into the environment, do they not? In other words, doesn't this process make the containers of those other potential pollutants safer? That's true for fluorination generally. The purpose is to impart barrier protection qualities. Right. And the issue here I want to emphasize is not with fluorination as a process. Fluorination does not per se create long chain PFAS and the orders do not purport to shut down Enhance's manufacturer or even stop them fluorinating. I think that goes to the It just says when you fluorinate, you can't create these highly toxic chemicals at a detectable level. And there are ways that Enhance could reformulate its process or change its operations slightly to completely eliminate those long chain PFAS. So I take it your co-counsel is going to talk about whether this was a new use or an ongoing use? That's correct, your honor. Because we don't even get to any of this argument if this was an EPA would submit that the correct method to take there would be to remand to the agency. But taking your honor's point that if you believe these orders shouldn't have issued in the first place, whether it was an ongoing use that my counsel will talk about that. I'm also certainly prepared to discuss any questions there. Well, there again, nothing would stop the EPA from doing a section six analysis, correct? That's correct. You lose if you do an analysis of the cost and the benefits. No, your honor. And I do want to address this. I mean, obviously, that's a hypothetical record because that's nowhere in existence at the moment, right? That's correct, your honor. It's a counterfactual. But I do want to address up front this difference between section five and six, because it's not exactly as presented by my friend on the other side. Section six has the exact same language about making risk determinations with not by regard to non-risk factors. And where cost benefit analysis comes in is there's three steps in section six, and only the third step is different between section six and five. First, you make a risk determination analysis to determine whether it presents or may present unreasonable risk. Second, you decide what's necessary to prevent that risk. What are the measures? And then third, what happens in section six is if you need to decide between multiple measures that both adequately prevent risk, then you do an analysis of effects to the economy or costs to the regulated entity. But you still need, what EPA still needs to do is decide what will actually prevent the risk. And that's in section six as well. If this was not supposed to be a section five case, in other words, it was improper under section five, do we vacate? Do we remand? What's the remedy? I believe that the most appropriate remedy would be remand for agency to address some of these threshold questions. And the reason for that, your honor, is that we have a couple of different buckets. I think there's the significant new use issue and the fair notice issue, and those really go to challenges to the long chain PFAS rule, a SNR. Byproduct impurity is in a different case because if you look at the orders, they expressly carve out from their prohibition any use by enhance for an exempt use. So the orders do not even report to regulate enhances manufacture as only an impurity, if that's what it is. And that issue has been teed up in the first valid enforcement action to the extent discovery is needed on that issue. Certainly the district court would be an appropriate place to do so. So- Talking about the action in Pennsylvania? That's correct, your honor. Now, what I mean by why remand is appropriate for both of these two EPA does not look at it and say, well, maybe should we not even be entertaining this notice because this doesn't apply with the long chain PFAS rule. That's not part of the process. TSCA section five says when EPA receives a notice, it shall review the notice and make a risk determination. And that's what happened here. In contrast, byproduct impurity, the reason that remand is required is EPA never made a finding that these are impurities or byproducts in the enhances interpretation of what the impurity exemption means and how it relates to the byproduct exemption that only gets them to the point of remand because they still need to have it be an impurity for the impurity exemption to apply. And what I mean by that is it's both a byproduct and an impurity. EPA's position would be that it is still regulable as a byproduct. But even if you disagree with that, we still need to know that these are impurities in the- EPA just didn't address the impurity issue, right? That's correct, your honor. An EPA in a section five case would traditionally not go through all the list of exemptions and impurity is only one of them. There are several in the statute and we're enhancing this interpretation prevail. Every single notice that it got for a new chemical substance or a significant new use would be submitted under protest and EPA would have to evaluate every exemption. That's not the statute that Congress wrote and it would not be an administrable way to do section five. So talking about the public health stakes, the stakes for enhance, which again is for them to change their fluorination processes, probably with some investment costs, maybe less profits, but not to shut down entirely or stop fluoridating. The institutional stakes. In Tosca, Congress charged EPA with protecting the public from toxic chemical substances. Administering such a program, administrability and fairness have been key concerns for the agency. And thus for nearly half a century, EPA has used significant new use rules to set a date certain after which point industry needs to come forward and explain their chemical uses before manufacture begins. And this makes sense. EPA has always excluded consistent with the statute and the meaning of significant use, ongoing uses known to EPA during rulemaking. This incentivizes industry to understand its uses of toxic chemicals consistent with the policy of Tosca for the burden to be on industry. It informs the public and that allows consumers, state, local and tribal governments to make informed decisions with the best available science. And it creates a level playing field for companies striving to comply with the law rather than creating a situation where SNRs had no finality and people could continually challenge them years or decades after the fact. So with those stakes of context, EPA submits that what is before the court is actually relatively narrow. Upon being presented with enhanced notices that it was submitting highly toxic long chain PFAS, did EPA correctly supported by the record and reasonably determine that these submitted those, they said we don't think section 5 applies. But in case we're wrong, we're submitting them, right? I mean, they didn't say we think that you're correct and we're correct in proceeding under section 5, right? Are you saying just because they submitted in response to the, they submitted notices, they said in those notices, we don't think section 5 proceedings apply to us, didn't they? I mean, what they said in the notices was this is not a disclaimer about the applicability of section 5. At no point did they actually ask EPA to make a determination that section 5 didn't apply. That was a litigating position that they took in the first filed enforcement action. And EPA always understood the notices to be a disclaimer preserving their defenses for the enforcement action. There was never actually a request from enhanced EPA. We would like you to make these determinations that were not subject to section 5. They've been, this manufacturing process has been ongoing. So I'm not sure I understand your arguments about new manufacturers on a level playing field. I'm not sure I'm getting that. Yeah, Your Honor. So imagine two different companies that are both manufacturing long-chain PFAS. One conducts thorough testing of its chemical processes. It knows that fluorination creates fluoroalkyl substances. That's what long-chain PFAS are. EPA submits a rulemaking saying we're proposing to designate the use of long-chain PFAS after 2015, a significant new use. They come forward. They say to the agency during rulemaking, we use this as an ongoing use. EPA would have excluded them from the long-chain PFAS rule, just as it did with, for instance, the semiconductor industry in this rule that also uses long-chain PFAS in the semiconductor industry. Then you take a different company that knows it makes long-chain PFAS, but it hides that information from EPA, waits for somehow that information to come to light, perhaps 5, 10, 20 years later. Then EPA brings an enforcement action and they say, well, you never could have regulated us in the first place. That other first company that played by the rules and participated in the rulemaking process, that created knowledge for the public. It allowed everyone to evaluate these risks and know what's going on in the industry. The second use, no one knew about. Well, that's quaint, but what the agency did here was didn't even list this industry as implicated by the rule when it was making the rule. In your description of the two businesses, the diligent one that participated in rulemaking versus the one that did not, if neither knew that the rule had any bearing on their industry, why would they be held to have participated or lacked diligence by not participating? That goes right back to the fundamental problem here of notice of even whether the rule applied to enhance. Your Honor, that goes to TSCA's burden-shifting framework after 2016, where Congress could not have had a more full-throated declaration of policy since 15 U.S.C. 2602, or 2601, explaining that the burden for testing, information sharing, and understanding what chemicals are in industry, the burden should be on industry, and they need to understand what they're doing. They need to anticipate a rule that may not even apply to them by its terms when they might apply to them by the agency's interpretation of it. Your Honor, my counsel will talk about this in more detail, but to directly answer your question on fair notice, EPA put forward, this is what we believe to be some uses. We know that there may be more of them, and it has never been the case in rulemaking of any sort, any government agency, that that agency in the notice needs to conclusively go through all of the possible industrial uses and explain what they are. But they didn't even list the NCIS code for the industry here. That's correct, Your Honor, but that has also never been a requirement, and it would be contrary to administrative law to enact such a standard when, especially in light of TSCA requiring that EPA act based on reasonably available information. I see I'm out of time. I have to finish my response. Congress in TSCA specifically said that EPA needs to act based on reasonably available information, and with that, I'll turn it over to my co-counsel. Thank you very much. Let's pick up right there if we could. Counsel said that the agency could act on reasonably available information. How is it that we don't hold the agency to have known about this use that was ongoing for 30 years by the time the rule was promulgated? I mean, how does that become a new use suddenly? Certainly. So that is significant new use is a term of art in TSCA, and Congress left it to EPA to determine whether uses are significant new uses. But new is not exactly a Certainly, but EPA's interpretation in the long-chain PFAS rule of significant new use as use is not previously known to it makes sense in light of TSCA. If it's new to EPA, it's new. That's correct, and that is aligned with TSCA's structure and stated policy goals, but it also is not inconsistent with the definition of new at the time that TSCA was enacted. As we explained at page 46 of our brief, there are dictionary definitions at the time of I don't know. It's one of those things that, again, you could travel under Section 6. Why did EPA travel under Section 5? As my colleague mentioned, Enhanced MISC ensures the distinction between Section 5 and Section 6. Under both Section 5 and Section 6, EPA acts on information that is reasonably available to it. So if EPA has no information to suggest that a use is intended, known, or reasonably foreseen to be used in a particular way, then that use would not be covered by Section 6, and Enhance's interpretation of TSCA would create a situation where neither Section 5 nor Section 6 would have covered Enhance's manufacture of long-chain PFAS, and that would be contrary to TSCA's purpose of protecting the public health and the environment. It also, I want to go back again to why EPA's interpretation of the term significant new use is aligned with TSCA's structure and stated policy goals. As I already mentioned, Congress left it to EPA to determine whether a use is a significant new use, and Congress also commands that EPA carry out its Section 5 duties based on information that is reasonably available to it. Then, in amending TSCA in 2016, Congress established, expressed in statute, that it is the policy of the United States that the development of information is the responsibility of those who manufacture and process chemical substances, because there's an information asymmetry between industry and EPA, with industry in a far better position to know how the chemicals— Going back to how you said the EPA construes new, you talk on page 47 of your brief that the Act specifically contemplates that some preexisting chemical substances will be added to the inventory later than their first use, and you cite Section 2607B1, which says, chemical substances that are processed only in small quantities solely for research purposes. Well, that's—this is a—it's way different from that. Certainly, and I'm hoping—hopefully I can clarify something that Ms. Stetson said. We are not asking the Court to interpret the term significant new use exactly the same as the definition—as the defined term new chemical substances. We just believe that it is appropriate to treat both terms the same. So, new chemical substances are chemicals, as Your Honor pointed out, that are not on the TASCA inventory and include certain preexisting substances. Now, it would be contrary to ordinary principles of statutory construction to, on the one hand, define new chemical substances without regard to whether the substance is preexisting or not, whereas, on the other hand, to, in the same subsection of the same statute, limit significant new uses to only those that are preexisting. That's the—that is the argument. Why would you ever go under Section 6? Section 6 would be— In these circumstances. And, you know, you've got existing industries who have all of the factors that Section—Congress wants you to take into account in Section 6. You're saying we don't ever have to go there. Certainly, that's—that's not what we're trying to say. EPA—it would be appropriate for EPA to undergo a Section 6 rulemaking process if it had information available to it to—that—indicating that it knew that a use was ongoing. Here, when EPA was undergoing Section 5 rulemaking, EPA had no information available to it indicating that Enhance's use was ongoing. And for that reason, it was appropriate for EPA to consider its use to be a significant new use subject to Section 6. If I can hit—talk very briefly about Enhance's fair notice argument. Enhance's argument that it lacked fair notice that the long-chain PFAS rule applied to its foreign nation process is misplaced here. Enhance clearly had notice that EPA considered its manufacture of long-chain PFAS to be a significant new use because as soon as EPA became aware of Enhance's manufacture of PFAS, EPA consistently communicated to Enhance that its manufacture of long-chain PFAS was a significant new use and thus that Enhance needed to comply with TSCA's notice requirements. Based on this communication, Enhance submitted the notices that prompted the at-issue orders—orders that are being challenged. That's kind of—you get to eat—eat your cake and have it too because you—you go to this business and say, we think you're a significant new use. We think you're under this and therefore you're required to submit this notice. They submit the notice because they are not wanting to be statutorily, I mean, in the wrong. And so then you say, well, they submitted the notice so now we have to—we have to go through this Section 5 analysis. That's quite circular to me. Your Honor, an important point here is that Enhance is not without remedy and Enhance—if Enhance truly believed that it was not subject to the long-chain PFAS rule, there are several other steps it could have taken. It could have petitioned EPA to repeal or amend the long-chain PFAS rule. It—it didn't do that. It could have timely challenged the long-chain PFAS rule. It didn't do that. And it could have and indeed is bringing these challenges in enforcement—in an enforcement case where EPA is seeking to enforce TSCA and the long-chain PFAS rule. It could have challenged the promulgation of the rule if it had noticed that the rule might apply to it. Correct? It—it—it could have—it could have filed a timely challenge to the long-chain PFAS rule. That's correct. Only if it knew that the rule had any applicability to it. Only if it knew that the rule was being promulgated. In other words, we're going back to fundamental APA notice principles here. And if they didn't have notice, they couldn't have challenged it. May I use the amount of time to answer the question? I think what's really important here, Your Honor, is that fair—fair notice is not an actual notice requirement. And the long-chain PFAS rule explicitly states that any use of long-chain PFAS is a significant new use. And then it expressly excludes all of the industries that had known ongoing uses to EPA. And the fluorination industry was not one of those uses. And then as I've already mentioned, once EPA found out that Enhance was manufacturing long-chain PFAS, it consistently and repeatedly communicated that to EPA—to Enhance. When do you say that Enhance knew that it had PFAS in its process? I'm sorry, Your Honor. Did you ask when? Yes. When do you say that Enhance knew? You know, this is not a fact that's developed in this record. But I think at the very latest, Enhance knew when EPA sent them the notice of violation, which is in 2021. Do you contend that they knew in—wasn't the rule promulgated in 2015? 2020, Your Honor. Do you think that they—do you take the position they knew before the rule was promulgated that they had PFASs in their manufacturing process? Your Honor, I think for sake of this argument, it's appropriate to assume that the facts are as Enhance alleges and that Enhance did not know until a few months after the long-chain PFAS rule was finalized that it was manufacturing long-chain PFAS. Okay. Thank you, Your Honors. If Your Honors have no further questions, we respectfully request that the Court deny Enhance's petition. Thank you. Your Honors, just a few quick points working backwards. First, on fair notice, it cannot be the case that the fair notice argument turns on this idea that once EPA gave notice many years after the significant new use rule was promulgated that Enhance was subject to the significant new use rule that that constituted fair notice. That is neither notice nor fair, as I think we say in our reply brief. And that also solves the problem that Mr. Martin mentioned during his portion of the argument when he put forward this hypothetical about the black hat company and the white hat company and the white hat company that comes forward and says we hide the manufacturing of PFAS. Enhance was not wearing a hat. That was the problem. Enhance had no idea at the time that the rule came out that it manufactured PFAS and neither did EPA, as we say on page 14 of our brief. Second, on new use, I want to be very clear that significant new use is not a term of art. It is not defined in the regulations. And Ms. St. Romaine suggested that the new chemical substance, which is specifically defined, somehow bears on this idea of significant new use. It does not. As we say in our reply brief, that default rule that you construe words the same way when they appear near each other in a statute is only a default rule that not some other definition that governs. For new chemical substance, there is a definition that governs. EPA could have but did not, as I mentioned earlier, impose the same kind of definition for significant new use. It did not. And that's because a new use is distinct from an ongoing use under the way that EPA and its regulations construe how section 5 and section 6 work together. Briefly on byproduct versus impurity, if the government is willing to suggest to enhance and to commit to enhance that it manufactures PFAS only as an impurity and that it can continue its fluorination services without shutting down its many locations, I think we would be very happy with that result. The reason that EPA is not able to commit to that is because it that enhances doing something when it manufactures and fluorinates these plastic products that is something other than creating impurities. Otherwise, we wouldn't be here. I do not think it is appropriate at this stage to suggest that the court remand back to EPA for it to make a finding EPA should have found in the first instance. These products, if you even get to this issue, are impurities. You don't need to get to this issue if you conclude, as we suggest you do, that a new use is a new use. That leads me to my last point. Mr. Martin also mentioned that this court should remand back to the EPA so that it can address these threshold legal issues. There is no warrant for that remand. Remands are appropriate when EPA has it within its ability to explain itself. A remand is not appropriate when EPA has acted outside of its statutory and new use. An ongoing use is not a new use. An impurity is an impurity. In all events, it has certainly lacked fair notice that any of this regime applied to it, if there are no further questions. Thank you, counsel. Thank you, Your Honor. The court will take a brief recess.